40938.   ROACH v. CARROLL.

DECIDED NOVEMBER 13, 1964.

*Conger & Conger, J. Willis Conger,* for plaintiff in error.

*Harold Lambert,* contra.

FELTON, Chief Judge. The special ground of the motion for a new trial assigns error on the court's failure to give the following charge: "When a witness shall be successfully contradicted as to a material matter, his credit as to other matters shall be for the jury, but if a witness shall swear wilfully and knowingly falsely, his testimony shall be destroyed entirely unless corroborated by circumstances or other unimpeached evidence. . ." *Code* § 38-1806.

"Under this rule as to wilful and knowing falsity in a material matter, it has several times been held, that if a witness swears at the trial to a certain state of facts in a material matter, and he has previously sworn to the contrary in the same case, and where he admits that his testimony was false, this constitutes a wilful and knowing false swearing, and requires the jury to reject his testimony entirely, unless it be 'corroborated by circumstances or other unimpeached evidence.' In such a case it has been held that the judge should so charge the jury, even without a request. [Cases cited.] But before this principle of such total rejection, with a duty of the court to charge the jury thereon, will have application, it must manifestly appear, not only that the witness on one or the other occasion has sworn falsely to a material matter, but that he has done so wilfully and knowingly. The rule does not extend to situations where it is shown to be reasonably possible that the discrepancy was occasioned by 'mistake or the failure of memory.' *Ivey v. State,* 23 Ga. 576, 581; *Skipper v. State,* 59 Ga. 63, 65. See *Robison v. State,* 114 Ga. 445 (40 SE 253). In construing the decision last cited, the Court of Appeals, in *Martin v. State,* 53 Ga. App. 213, 216 (185 SE 387), has gone so far as to hold: 'It would thus seem that the Supreme Court has limited the ruling in (the *Stafford* and *Plummer* decisions) to cases where the witness admits that he 'wilfully and knowingly swore falsely'; and there-

fore this ruling would not apply in this case, where the witness denied that she swore wilfully and knowingly falsely, but said that if she swore to a contradictory state of facts, it was because she was confused and embarrassed and did not understand thoroughly the questions that were put to her.' To like effect, see *Rumph v. State,* 24 Ga. App. 338 (1, a) (100 SE 768) ; *Spence v. State,* 52 Ga. App. 383 (2), 384 (183 SE 339)." *Smaha v. George,* 195 Ga. 412, 418 (24 SE2d 385). The court then pointed out that ". . . *We think it might be restricting the rule in the Stafford and Plummer cases too far to limit its application to cases where the witness admits his guilt of perjury, so as to exclude its application where the nature and character of the testimony is such as would render the purpose to falsify plainly manifest. . . .*" (Emphasis supplied.) The court went on to hold that, in that particular case, it was not reversible error for the judge to omit, without request, to charge the provisions of *Code* § 38-1806, where the witnesses involved, while admitting a discrepancy in their previous testimony with respect to an incidental question, disclaimed any intent to testify falsely and sought to explain the discrepancy as due to a failure on their part to refresh their recollection as to such matter, which was not impressed on their minds, and due to the confusion caused by the circumstances of the cross examination in their previous depositions. The facts in the instant case are materially different from those in the case just cited.

Mrs. Carroll's testimony *before* lunch was to the following effect: That she had no warning at all that the defendant was going to stop his vehicle immediately ahead of her (she later testified that she saw his tail lights come on when he and the long line of cars first slowed down and again just before he skidded sideways) ; that she did not tell the defendant and his wife that she really didn't see them stopping until those red lights just came right up in her face (the defendant testified that the plaintiff told him that, "I looked around and I saw the great big tail lights" and that all she saw was the big red light and the defendant's white shirt) ; that "All the cars slowed down—I saw—the tail lights come on and *I had stopped,* and as I put it in second to start up—our car is a shift—again—we

had all started up again, and Mr. Roach slammed on his brakes and turned sideways on the road. . . All the cars slowed down, none of them came to a complete stop, and I slowed down to *almost* a stop. . . Mr. Roach made the remark to the troopers investigating, said, 'The lady had stopped,' he didn't know what had happened. When I *stopped* like that my children were on a mattress in the back, and I have a little 11 year old girl who was riding in back of me and when she came down feet first it shoved the seat—I don't know whether it's something like a bucket seat—up against the steering wheel and my wrist was caught down in the steering wheel and the steering wheel caught me across my stomach, and God knows I tried—*I had stopped* but evidently the lick on my stomach must have knocked—my foot must have come up off of the brake and when it went relaxed it must have hit the gas because then is when I hit the left rear end of his car, but he had told the troopers himself. He said, 'I wonder what happened. *The lady had stopped,*' and *I had stopped.* The one that investigated looked for skid marks where I had maybe skidded into him, but there weren't any skid marks or anything. . . *I stopped at least 15 feet from his car,* until I lost control of the car and God knows, I don't know what happened. It happened all of a sudden . . . you start up again and stop suddenly and everything in the back, the ice chest and the children and everything and the little girl's feet come skidding and it pushed me . . .'; that when Mr. Roach skidded, after applying his brakes, she brought her car to a *complete stop;* that she hasn't been able to figure out what happened yet; "Q. And you had come to a *complete stop?* A. Yes sir, until I was hit in the back by my children made me lose control. *I had stopped* . . . Q. And you are sure that when his car skidded across the road that your car came to a *complete stop* some 10 or 15 feet from—A. *Yes sir, I am.* . . . Q. How fast were you going when you hit it? A. I don't know. I just told you that I had the car in second, and if you're *slowing down* and put the car in second you can't be going too fast when you're just starting up. Q. Then you came to another complete stop after that? A. No sir. We all slowed down—no one stopped. The car that hit

the dog never even stopped. Everybody slowed down. Q. The only complete stop you made then was after you saw his car skid—A. Skidding across—*when he was across the highway I did come to a complete stop,* and it was after that I lost control and hit the left rear. . .''

Mrs. Carroll's testimony *after* lunch was to the following effect: "Q. . . . Now, before you collided with the automobile being driven by Mr. Roach, had you at any time stopped? A. *I had not stopped.* Q. You had not stopped, but you had slowed down? A. Slowed down when all the other cars slowed down. I told the other lawyer repeatedly—he asked me if I had stopped and then started again. I told him, 'No,' that I had slowed down and when Mr. Roach stopped and the car went sideways across the road, I slammed on brakes. I repeatedly told him I had slowed down and put the car in second when all the cars started up—*I did not come to a complete stop.* I told him that. . . Q. Was it about the same time that the children slid forward that you hit the automobile being driven by Mr. Roach? A. Yes, the first time I didn't put on brakes—I just slowed down—everybody slowed down—you put on brakes —*I didn't come to a complete stop.* I told the other lawyer that two or three times he asked me about it. . . . Q. When Mr. Roach applied his brakes did he skid to the right or to the left of the center line? A. He skidded around and the tail end of the car went around to the *right.* . .'' (Trooper Stewart, who investigated the accident, testified that the rear end of defendant's car slid to the *left* and the front was to the right edge of the road); that she turned her automobile to her right to try to avoid the collision. "Q. Do you remember telling me, when I asked you about stopping, that first when you saw all the red lights you slowed down and put your car in second gear, and then when you saw . . . Mr. Roach skid across the road that you came to a complete stop 10 or 15 feet from him and that when you came to a stop the children and other things in your back hit the seat you were sitting in—A. I told you that I slammed on brakes and *I came to a stop,* but I don't know whether the car—I told you I didn't know what had happened— it happened so sudden—I was so injured—*I don't know whether*

*the car stopped and stood there and then it went on or what
happened*. . . [Counsel then had the reporter read from the
transcript of his cross examination of the plaintiff in the morn-
ing, in part as follows: "Q. When Mr. Roach skidded, after
applying his brakes, then you brought your car to a *complete
stop?* A. *Yes sir, I did.*"]; "Q. Mrs. Carroll, do you now
remember telling me before lunch that you came to a complete
stop some 10 or 15 feet from the Roach car? A. *I didn't say a
complete stop. I came to a stop* and *when I stopped* all of a
sudden when that car went flying across the road I put on
brakes, like anybody else would put on brakes, . . . *I didn't
say a complete stop. I told you I didn't know what had hap-
pened.* . . Q. All right, let's give you a choice now—*did you
or did you not stop?* A. I slammed on brakes and the children
come down and hit me. I can't tell you whether I—I told you
that before lunch what happened—whether I came to a complete
stop. Things like that happen all of a sudden and you can't—
unless you want to lie about it—I could tell you I didn't stop—
I could tell you I stopped. I'm not going to make up no lies—
I'm just going to tell you what happened the way I know it hap-
pened, and that's all I can do." Concerning how much time she
had in which to stop, the plaintiff testified variously as follows:
". . . I was going slow enough that I had figured that out
that if I had . . . and I turned this way and I had stopped.
. . . There was enough room that another car could have
gotten in between us, because I try to stay that way. . . I
was way behind him and I had plenty of time. . . I was way
behind the car—had to be when he went flying across. . . I
didn't have plenty of time to stop when the man was going on
all of a sudden applying brakes and start skidding—I didn't
have plenty of time to stop . . . it was on a wide open
highway—nobody would have known anybody was going to stop
on a highway like that. . . Q. Were you far enough behind
him that if it hadn't been for your children sliding into you, you
could have stopped before you hit him? A. I couldn't judge
that. . . Q. I'm trying to find out how far you were behind
him, Mrs. Carroll. You said you were not as far as from here
to the wall. A. No, not after the dog was hit, no, because all

the cars went right on up, you know, like when they come to a stop light or anything—I wasn't that far, no."

As to the size of the dog, the plaintiff testified that he was a 13 or 14 lb. puppy, which she wouldn't think was big enough to do any damage to the defendant or his car, since the car that hit the dog had gone on. The defendant testified that it was a "fair size dog, enough that could injure a person if they knocked the car out of line," and his wife estimated its size as 60 lbs. The plaintiff testified that the defendant made the statement in the presence of her and the State Patrolman that he stopped because he didn't want to hit or kill a dumb animal, and that he didn't say anything about not wanting to hit the dog to protect his own life. The defendant, on being asked if he didn't make the statement to the State Patrol in the presence of Mrs. Carroll that he did not like to run over dumb animals lying in the road, replied, "No sir, I did not make that statement. The thing was I don't want to wreck my car or nobody else. I had my wife with me to think about, if I don't care about myself. If I didn't care about myself or my wife or nobody else I'd have run over the dog."

An examination of the above testimony reveals that the plaintiff testified some *ten* times that she had stopped before the collision with the defendant, that she answered in the affirmative *several* times the direct question as to whether she had made a *complete stop*, and that she made the statement once of her own accord that she had indeed made a complete stop. On the other hand, her testimony after lunch amounted to a combination of flat denials that she had made these statements which, the record shows, were made by her under oath, and of assertions that she didn't really know what had happened. The jury might have found that the nature and character of this testimony is such as to render the purpose to falsify plainly manifest, as was stated in the *Smaha* case, supra, so the provisions of *Code* § 38-1806 should have been charged; therefore the court erred in its judgment overruling the motion for a new trial on the special ground.

■ The second headnote requires no further discussion.

*Judgment reversed. Frankum and Pannell, JJ., concur.*